UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

STACY PROCTOR,

                Plaintiff,

v.

NORTHERN LAKES COMMUNITY
MENTAL HEALTH AUTHORITY,

                Defendant.

_____/

Case No. 1:11-cv-162

Hon. Robert J. Jonker

**REPORT AND RECOMMENDATION**

This is a *pro se* civil rights action in which plaintiff has alleged that defendants violated her rights under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 312101 *et seq.*, violated portions of the Employment Retirement Income Security Act of 1984 ("ERISA"), 29 U.S.C. § 1001 *et seq.* by failing to notify plaintiff of her rights under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), 29 U.S.C. §§ 1163 and 1166, and failed to compensate plaintiff for her Paid Time Off (PTO) earnings. This matter is now before the court on a motion for summary judgment filed by defendant Northern Lakes Community Mental Health Authority (sometimes referred to as "NLCMH") (docket no. 42).

    **I.**        **Factual background**

Plaintiff began working for defendant in 2006. Stacy Proctor Dep. at p. 27.[1] On January 12, 2006, plaintiff underwent a physical examination prior to her employment with

---

[1] Portions of Stacy Proctor's Deposition are attached to defendant's motion for summary judgment. *See* docket no. 43-1. Defendant's counsel provided the court with a complete copy of Ms. Proctor's deposition at the April 5, 2012 hearing. For purposes of this motion, the court will cite to the deposition in the court record (docket no. 43-1) unless otherwise specified.

defendant, which reflected that she suffered from lupus and mild asthma. *Id.* at pp. 35-36; Physical Exam Form (docket no. 43-2 at p. 2). However, these conditions did not restrict plaintiff's ability to perform the skills listed on the physical examination form. Proctor Dep. at p. 41. Those skills included the ability to: stoop; squat; bend in awkward positions; reach; twist and reach at the same time; twist at waist; kneel for 15-20 minutes; sit on floor and regain standing position from floor; stand for long periods of time; walk for long periods of time; run; walk backwards; maintain balance; negotiate stairs frequently; normal range of motion (neck, shoulders, elbow, wrists, knees, ankles and hips); lift 70 pounds; push/pull a lawn mower, snowblower and vacuum cleaner; shovel snow/ice; rake lawn; perform one or two person client transfer; hear conversational level voices; and adequate vision for reading and distance. NLCMH Physician Examination Check Sheet (Jan. 12, 2006) (docket no. 43-2 at p. 4).

Plaintiff was employed as a resident care aide ("RCA") for defendant on January 9, 2006. NLCMH RCA Trainee/Temporary Employment Agreement (docket no. 43-2 at p. 6). At that time, plaintiff acknowledged that she understood the six-page "Position Description" for an RCA at the Pearl Street Home. Position Description (docket no. 43-2 at pp. 10-15); Proctor Dep. at pp. 48-49. Plaintiff became a full time employee of defendant effective January 6, 2007. NLCMH RCA Full Time Employment agreement (docket no. 43-2 at p. 8).

The Position Description listed a number of "Essential Functions" and qualifications for RCA's. Position Description (docket no. 43-2 at pp. 10-15). The "Essential Functions" relevant to this action include the following:

> 5.   Will become able to demonstrate and implement emergency procedures to ensure resident safety which include: fire evacuation, tornado procedure, and power outage (after in-home training). CPR, first aid (emergency and non-emergency) and physical intervention

2

techniques as it applies to the home will be implemented following
formal training.

\*       \*       \*

18.       Will be able to lift at least 70 pounds, remain on feet for long periods
of time, negotiate stairs, bend, stoop, knee and twist as necessary in
the care of the residents and the home in which they live."

*Id.* at pp. 10, 12.  The Position Description included the "qualifications" for the RCA position (e.g.,

minimum high school education or GED, must provide three to four references, etc.).  *Id.* at p. 13.

One of the qualifications relevant to this litigation was that the RCA be physically able to perform

the "essential functions" with respect to physical exertion, i,e, "[m]ust be able to lift 70 pounds,

remain on feet for long periods of time, bend, stoop, kneel and twist as necessary in the care of the

consumers and the home in which they live."  *Id.* These qualifications were consistent with the

licensing requirements of the NLCMH, which was licensed by the State of Michigan as a community

mental health licensee authorized under the Michigan Administrative Code (Mich. Adm. Code)

(sometimes referred to as "the Code") § 400.14101 *et seq.,* to operate adult foster care small group

homes (such as the Pearl Street Home).  Rosemary Pierson Decl. at ¶¶ 4-5 (docket no. 43-3).  The

Pearl Street Home has a capacity to serve six adult foster care residents.  *Id.* at ¶ 6.  Pearl Street

Home is staffed by two RCA's,  referred to in the regulations as "Direct Care staff" who provide

"personal care, protection and supervision to the residents."  *See* Mich. Adm. Code  §

400.14102(1)(h) ("'Direct care staff' means the adult who is designated by the licensee to provide

personal care, protection and supervision to residents").

Under the Code, RCA's or direct care staff, are required to be competent in several

areas.   As an initial qualification, direct care staff "shall be persons who are not residents." Mich.

Adm. Code Rule 400.14201(1).  Direct care staff must "(a) Be suitable to meet the physical,

emotional, intellectual, and social needs of each resident" and "(b) Be capable of appropriately handling emergency situations." *Id.* at Rule 400.14204(2)).  Direct care staff shall be competent in: reporting requirements; first aid; cardiopulmonary resuscitation; personal care, supervision and protection; resident rights; safety and fire prevention; and prevention and containment of communicable diseases. *Id.* at Rule 400.14204(3).  Direct care staff "shall be in such physical and mental health so as not to negatively affect either the health of the resident or the quality of his care." *Id.* at Rule 400.14205(1).

As the licensee's designee, RCA's are responsible, with the resident's cooperation, of following the resident's physician's instructions regarding medication, special diet and other health care needs that can be provided in the home.  *Id.* at Rule  400.14310.  RCA's are also responsible for the residents' hygiene and afford the residents the opportunity for assistance in bathing, dressing or personal hygiene from a member of the same sex.  *Id.* at Rule 400.14314. Finally, a licensee (such as NLCMH) "shall assure emergency transportation through the use of a recognized available community service or vehicle that is owned by the licensee, administrator, or direct care staff on duty."  *Id.* at Rule 400.14138.

The current dispute began during the summer of 2009.  On July 26, 2009, plaintiff visited her family physician, Brandon Peltier, D.O., stating that she had had left hand numbness and weakness for a few weeks, some right hand numbness and had a weakened grip.  Medical Record (July 26, 2009) (docket no. 44-1 at p. 18).  Michelle (Shelly) Davis, the Program Coordinator for Pearl Street, stated in her declaration that on July 27, 2009, plaintiff reported that she had some tingling in her hands and might need some time off and asked what type of paperwork she would need to complete if she needed time off.  Michelle Davis Decl. at ¶ 5 (docket no. 43-4).  Ms. Davis

told plaintiff that she would request Family and Medical Leave Act (FMLA) paperwork from Bonnie Bliven in the human resources office. *Id.* Ms. Davis sent an e-mail to Ms. Bliven that day, requesting to "have a copy of the FMLA paperwork put in my mailbox for Stacy Proctor." Davis e-mail (July 27, 2009) (docket no. 43-4).

Plaintiff was on vacation from August 2, 2009 through August 16, 2009. Proctor Dep. at p 81. While on her vacation, plaintiff was examined by a neurologist, Val Syring, D.O., who reported on August 4, 2009 that plaintiff had bilateral ulnar neuropathy left greater than right and median neuropathy on the left. Peltier Dep. at pp. 11-13 (docket no. 44-1); Report of Dr. Syring (docket no. 44-1 at pp. 21-24). In a report from August 6th, Dr. Syring stated that an EMG nerve conduction study demonstrated "evidence of a severe ulnar neuropathy at the elbow level that is predominantly demyelinating at the present time." Report of Dr. Syring (Aug. 6, 2009) (docket no. 44-1 at pp. 26-28). Plaintiff was also examined by a rheumatologist, Peter Zadvinski, M.D., who determined that plaintiff had questionable "seronegative lupus" (finding "no obvious clinical signs of lupus or other connective tissue disease"), left ulnar neuropathy, fibromyalgia and chronic pain. Report of Dr. Zadvinski (Aug. 13, 2009) (docket no. 44-1 at pp. 31-33).

Plaintiff returned to Dr. Peltier on August 14, 2009. Report of Dr. Peltier (August 14, 2009) (docket no. 44-1 at pp. 37-38). Plaintiff's assessment at this time was as follows, "[p]olyarthralgias with paresthesias, dysesthesias, and now a demyelinating process of the left ulnar nerve." *Id.* Defendants have presented a doctor's note from Dr. Peltier for "Proctor, Stacy," which is dated August 14, 2009 and states "Off work 17 Aug 09 - 30 Aug 09 FMLA paperwork pending."

Defendant's Exh. A (Summary Judgment Hearing).[2]  Dr. Peltier testified that he took plaintiff off of work due to the symptoms in her hands and arms, the numbness, the weakness and the fact that he could not diagnose it.  Peltier Dep. at pp. 18-19.

Although the doctor's note did not specify a lifting restriction in taking her off work, plaintiff testified that she was concerned that Dr. Peltier "was putting me on a lifting restriction" and that her employer "doesn't let people work with restrictions."  Proctor Dep. at p. 83.  Plaintiff testified that she kept the doctor's note in her pocket, "just in case they would not let me work."  *Id.* at pp. 83, 149.  On Sunday August 16th (the day before her return to work), plaintiff spoke with Ms. Davis, at which time they discussed plaintiff's "restrictions from the doctor."  *Id.* at pp. 104-05. Plaintiff told Davis that she had a lifting restriction and that she could not be the primary transportation person at Pearl Street due to medications that limited her driving. *Id.* at p. 105.  While plaintiff testified that the lifting restriction was ten pounds, plaintiff later testified that she did not know if she mentioned a specific weight restriction to Ms. Davis.  *Id.*

Plaintiff returned to her scheduled shift on August 17, 2009.  Proctor Dep. at pp. 81-82.  Later that day, plaintiff spoke with Ms. Pierson regarding her (plaintiff's) restrictions.  *Id.* at p. 121.  At that time plaintiff advised Ms. Pierson that she had a lifting restriction and needed to limit her driving and that her left arm was numb.  *Id.* at p. 122.  Ms. Pierson told plaintiff to call someone to replace her, to go home, and to put the doctor's note on Ms. Davis' desk.  *Id.*  at pp. 122, 150-51.

---

[2] A copy of this note was also filed as an exhibit to defendant's motion for summary judgment.  *See* Dr. Peltier's note (docket nos. 43-2 at p. 35 and 44-1 at pp. 40, 42).  At his deposition, Dr. Peltier questioned the date of the note, but after reviewing his calendar determined that the note was dated correctly.  Peltier Dep. at pp. 17-18.  At the motion hearing, plaintiff argued that the scrip was a forgery.  However, plaintiff presented no evidence to support her claim.  Moreover, plaintiff agreed that even if the date was incorrect, the substance of the note (i.e., that she was off work from August 17, 2009 through August 30, 2009), was accurate.

Ms. Pierson was surprised that the note precluded plaintiff from all work, given plaintiff's representations that she could work with restrictions. Pierson Declaration (docket no. 43-3 at ¶ 14). Pierson stated that "on the basis of Dr. Peltier's note" [which stated that plaintiff was off of work from August 17th through August 30th], she was unable to allow plaintiff to return to work and administered plaintiff's time off as FMLA time. *Id.*

Ms. Davis spoke with plaintiff later on August 17th, and told plaintiff that "she should not report the next day since Dr. Peltier's note indicated she could not work." Davis Declaration at ¶ 9. According to Ms. Davis, plaintiff asked whether she would be allowed to work if she got a slip "that only restricted her from lifting." *Id.* Ms. Davis told plaintiff that "she didn't think so since her ability to lift was required as an essential function of the RCA job." *Id.*

Plaintiff saw Dr. Peltier on August 19, 2009. Peltier Dep. at p. 23. At that time, Dr. Peltier signed the physician's portion of plaintiff's FMLA certification. FMLA form (docket no. 43-2 at pp. 30-33). Defendant relies on two relevant portions of the FMLA certification, ¶¶ 3 and 5. At ¶ 3, Dr. Peltier identified plaintiff's inability to perform job functions:[3]

> 3.    Use the information provided by the employer in Section I to answer this question. If the employer fails to provide a list of the employee's essential functions or a job description, answer these questions based upon the employee's own description of his/her job functions.
>
> Is the employee unable to perform any of his/her job functions due to the condition?  __ No  x Yes
>
> If so, identify the job functions the employee is unable to perform: Lift > 10#, no bend/twist, no prolonged lifting

*Id.*

---

[3] The court notes that the job functions were those as set forth in the RCA position description. *See* FMLA form (docket no. 43-2 at p. 30).

At ¶ 5, Dr. Peltier identified the amount of leave needed by plaintiff:

5.      Will the employee be incapacitated for a single continuous period of time due to his/her medical condition including any time for treatment and recovery?   __No  x Yes

If so, estimate the beginning and end dates for the period of incapacity   14-28 Aug 09

*Id.*  Dr. Peltier also stated that plaintiff would have episodic flare ups of her condition in the future, i.e., one flare up per month for a duration of two days per episode.  *Id.*  Dr. Peltier testified that "at the time I took [plaintiff] off of work, I only had the limitations of no lifting greater than 10 pounds, no bending, twisting, no extended lifting."  Peltier Dep. at p. 41.  The doctor also testified that, "at the time I took her off of work, certainly she did have a worsening clinical condition and certainly I would consider it reasonable to assume that she would have to come off of work completely."  *Id.* at pp. 41-42.  Dr. Peltier examined plaintiff again on August 28, 2009, at which time her condition had deteriorated to include numbness in her legs, wasting of her calves, pain down her right arm and a report that she "feels like she is in a fog." *Id.* at p. 26-27;  Medical Record (Aug. 28, 2009) (docket no. 44-1 at p. 44).  Plaintiff aslo told the doctor that "she doesn't feel that she can go to work based upon the symptoms and limitations that she has."  Medical Record (Aug. 28, 2009) (docket no. 44-1 at p. 44).  Dr. Peltier prepared a slip precluding plaintiff from working until September 14th, and completed a certification for NLCMH's short-term disability administrator, stating that plaintiff was "totally disabled" and unable to work as of August 19, 2009. Medical Record (Aug. 28, 2009) (docket no. 44-1 at p. 48); Certification for short term disability (Aug. 28, 2009) (docket no. 44-1 at pp. 48-50).  Dr. Peltier signed a slip, dated August 28, 2009, which read "Off work on 28 Aug 09 -- 14 Sept 09."  Doctor's slip (docket no. 43-2 at p. 35).  In her declaration, Pierson identified this

8

document as "a second work slip from Dr. Peltier, dated August 29, 2009" which plaintiff submitted to NLCMH and which was administered as FMLA leave time.  Pierson Decl. at ¶ 16.

Dr. Mutch examined plaintiff on September 16, 2009, at which time her condition had significantly deteriorated, with symptoms of weakness, numbness and spasms.  Peltier Dep at pp. 32-35; Medical Record (Sept. 16, 2009) (docket no. 44-1 at p. 52).  Dr. Mutch noted that plaintiff stated that "she has trouble putting the car into park after it has been in gear."  Medical Record (Sept. 16, 2009) (docket no. 44-1 at p. 52).  On September 25, 2009, Dr. Peltier completed a short term disability certification which listed August 19, 2009 as the "Date Total Disability Began," described plaintiff as totally disabled from her "medium" [exertional level] occupation, with no projected return to work date.  Certification for short term disability (Sept. 25, 2009) (docket no. 44-2 at p. 1).

Dr. Peltier's treatment records from October 12th, 19th and 30th reiterated plaintiff's deteriorating condition and her ongoing inability to work.  Peltier Dep. at pp. 35-40; Medical Records (Oct. 12 and 19, 2009) (docket no. 44-2 at pp. 3-4, 12-13).  In a Medical Examination Report directed to the Michigan Department of Human Services (DHS), dated October 12, 2009, Dr. Peltier  notd that plaintiff had neurological and mental abnormalities, that her condition was deteriorating, that she had several limitations (e.g., could occasionally lift up to 10 pounds during an 8-hour workday, could never lift 10 pounds or more, could never use her hands/arms to perform grasping, reaching, pushing/pulling or fine manipulation , could never operate foot/leg controls, and had a mental limitations in maintaining sustained concentration).  DHS Medical Examination Report (Oct. 12, 2009) (docket no. 44-2 at pp. 6-7).  Dr. Peltier continued to certify that plaintiff was totally disabled from her medium exertional occupation for purposes of short term disability insurance.

Certification for short term disability (Oct. 12, 2009) (docket no. 44-2 at p. 10).  Plaintiff suffered

a myocardial infarction on October 31, 2009 and was hospitalized for nine days.  Peltier Dep. at pp.

45-58; Medical Records and Doctor's Certifications  (Nov. 13, 16, 17, 30,  2009; Jan. 6, 20, 29,

2010; Feb. 23, 2010; March 11, 15, 29, 2010; April 5, 2010) (docket no. 44-2 at pp. 15-51).  The

doctor's records reflect that plaintiff was "totally disabled", unable to work, and that there was no

accommodation that would allow her to return to work.  *Id.*  Dr. Peltier testified that as of the date

of his deposition (December 15, 2011) there was no accommodation that an employer could provide

that would enable plaintiff to return to work.  Peltier Dep. at pp. 57-58.

NLCMH policy requires that any return to work following medical leave be

accompanied by a doctor's certification that the employee is fit for duty.  *See* Northern Lakes

Policies -Workforce Policies - Leave Provisions (docket no. 43-2 at pp. 60-62).  At her deposition,

plaintiff acknowledged that she knew about the policy for "taking time off for medical issues," had

access to NCLMH's "Leave Without Pay policy" and the "FMLA policy,"and knew that she needed

a doctor's slip to take off time related to a medical condition.  Proctor Dep. at pp. 148-49, 152-53.

  At her deposition, plaintiff conceded that she knew of no document in which a doctor stated that

she could "return to work with or without some restrictions."  *Id.* at pp. 76-77.  Plaintiff testified that

she knew that the FMLA provided up to 12 weeks of job protection for those employees afforded

leave under the Act.  *Id.* at p. 51; Northern Lakes Policies (docket no. 43-2 at pp. 60-62).  At the

motion hearing, plaintiff agreed with defendant's statement that "Plaintiff knew that if she did not

return to work at the expiration of the twelve weeks of FMLA leave, she would have no job

protection under the FMLA and her employment would terminate."  Defendant's Brief, Statement

of undisputed material facts, ¶ 32.

NLCMH recorded plaintiff's employment termination as effective on November 24, 2009. Davis Decl. at ¶ 12; Thomas Denton Decl. at ¶ 5 (docket no. 44-3 at pp. 2-3). According to Ms. Davis, NLCMH reached this determination because plaintiff did not obtain a "return to duty certification" from her physician and was never released to return to work.  Davis Decl. at ¶ 12.

In a notice dated January 7, 2010, plaintiff was advised of her right to elect COBRA continuation coverage for the period ending June 21, 2011.  Proctor Dep. 89-90; Notice of Continuation Coverage (Jan. 7, 2010) (docket no. 43-2 at pp. 37-48).  The COBRA notice was sent to plaintiff's address at 433 Allen Street in Cadillac, Michigan.  *Id.*  The notice advised plaintiff that she had until March 8, 2010 to make the COBRA election and that she could pursue a COBRA premium subsidy which provided 65% of the premium payment.  *Id.*  Plaintiff testified that she received the notice but did not elect coverage because she could not afford the COBRA premiums.  Proctor Dep. at pp. 89-90.  Plaintiff further testified that she applied for the COBRA premium subsidy but was denied.  *Id.*

NLCMH Human Resources Manager Tom Denton stated in his declaration that at no time following the termination of plaintiff's employment (i.e., November 24, 2009), did she request information from NLMCH regarding her life insurance conversion rights.  Denton Decl. at ¶¶ 5-6.  Although Mr. Denton had no additional personal knowledge regarding this issue, he was subsequently advised that plaintiff requested information on May 26, 2010 regarding the conversion of the group life insurance policy plan to an individual policy from the insurer (Lincoln Financial Group), and that plaintiff was told that she was too late to apply for the conversion.  *Id.* at ¶ 7.

In her response to NLCMH's motion for summary judgment, plaintiff points to an e-mail from Mr. Denton to Ms. Chmielewski dated December 28, 2009, regarding sending plaintiff's

COBRA notice, with handwritten references to "Benefits" which include health insurance ("BC # 1 single"), dental insurance ("Dental upgrade single") which were cancelled on December 28, 2009; short term disability ("STD") which was terminated on December 28, 2009; long term disability ("LTD") which was listed as "on spreadsheet 12-29-09"; and a notation for "Life -?". *See* Denton e-mail (December 28, 2009) (docket no. 48-4 at p. 36); COBRA continuation election forms and related materials   (docket no. 48-4 at pp. 4-9).   In addition, a handwritten note in plaintiff's employment file states, "Need info on long term & short term disability $ & life ins. cost?". *See* Defendant's Supplemental Response to Plaintiff's First Request for Production of Documents (docket no. 48-1 at p. 3).

The court record also includes a copy of an "Application for conversion of Group Life Insurance" from the Lincoln Financial Group.  *See* Application for conversion of group life insurance policy (docket no. 43-2 at pp. 50-54).  The application lists plaintiff as the proposed insured and was signed on April 7, 2010 by Pam Chmielewski, the plan administrator.  *Id.* at p. 50. The application includes instructions for the employer and employee boldface print as follows:

> **A.     EMPLOYER: Please complete all of Section A, date and sign form to help us process the application quickly.  We must receive this form within 31 days of "Date Employment Terminated" as shown on this form.**
>
> \*       \*       \*
>
> **B.     EMPLOYEE: Please complete all of Section B, date and sign form to help us process your application quickly.  We must receive this form within 31 days of "Date Employment Terminated" as shown on this form.**

*Id.*  The application states: that plaintiff was hired on January 9, 2006; that plaintiff last worked August 17, 2009; that plaintiff's employment was terminated on November 24, 2009; that plaintiff's

group insurance was terminated on April 7, 2010; and that "Amount of Current Insurance Available" was $44,000.00. *Id.*

## II.     Procedural Background

On or about November 11, 2009, plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging that as of August 17, 2009, NLCMH denied her the ability to work with an accommodation in violation of the ADA. *See* Charge of Discrimination (docket no. 43-2 at p. 56). On February 14, 2011, plaintiff filed the present lawsuit consisting of two counts directed at defendant. In Count I, plaintiff alleged that defendant violated the ADA by failing to accommodate her disability. Compl. (docket no. 1-1 at pp. 5-6). In Count II, plaintiff alleged that defendant failed to provide her with a timely notice of COBRA continuation rights and failed to timely submit the forms to convert her group life insurance policy into an individual life insurance policy. *Id.* at pp. 6-7. Defendant has moved for summary judgment on both counts.

## III.    Motion for summary judgment

### A.     Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 further provides that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by":

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the parties' burden of proof in deciding a motion for summary judgment:

The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case. Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted). "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). However, the court is not bound to blindly adopt a non-moving party's version of the facts. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

**B.     Count I: ADA claim**

**1.     Elements**

Plaintiff claims that defendant discriminated against her in violation of the ADA because it failed to accommodate her disability. The ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job

14

training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

Discrimination under the ADA includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." *Id.* at § 12112(b)(5)(A).

"To make out a prima facie case of discrimination under the ADA, a plaintiff must show (1) that she or he is an individual with a disability, (2) who was otherwise qualified to perform a job's requirements, with or without reasonable accommodation; and (3) who was discriminated against solely because of the disability." *Spees v. James Marine, Inc.*, 617 F.3d 380, 395 (6th Cir. 2010) (internal quotation marks omitted). "The third element requires that the plaintiff suffer an adverse employment action." *Id.*

The ADA defines a "qualified individual" as

. . . an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires. For the purposes of this subchapter, consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job.

*Id.* at § 12111(8).

In addition, the ADA defines a "reasonable accommodation" to include

(A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and

(B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the

15

provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

*Id.* at § 12111(9).

In establishing a prima facie case of discrimination, a plaintiff also "bears the initial burden of proposing an accommodation and showing that that accommodation is objectively reasonable." *Johnson v. Cleveland City School District*, 344 Fed. Appx. 104, 111 (6th Cir. 2009), quoting *Kleiber v. Honda of America Manufacturing, Inc.*, 485 F.3d 862, 870 (6th Cir. 2007).  Once the plaintiff has made that showing, the burden of proof shifts to the defendant to show that the accommodation would be an undue hardship.  *Johnson*, 344 Fed. Appx. at 111, citing *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1108 (6th Cir. 2008).

## 2.    Discussion

NLCMH contends that it did not violate the ADA because it was required to enforce the Michigan Administrative Code provisions regulating the care of adult residents, which would bar plaintiff from work while she was unable to meet the physical requirements of the Code.  For purposes of this motion, defendant concedes that plaintiff has a disability under the ADA and meets the first element of her prima facie burden.  Defendant's Brief at p. 13 (docket no. 43).  The issue before the court is whether plaintiff can establish the second element of a prima facie case of disability discrimination, i.e., whether plaintiff was otherwise qualified to perform her job requirements, with or without reasonable accommodation.

Here, plaintiff's job required the ability to lift in excess of ten pounds, and twist and bend, which are essential functions of the RCA position.  *See* Position Description (docket no. 43-2 at pp. 10-15); Mich. Adm. Code  §§ 400.14102(1)(h), 400.14201(1)-(3), 400.14205(), 400.14310,

16

and 400.14314.  Under the ADA, a "qualified individual" must be able to perform the "essential functions" of the job at issue:

> The term "qualified individual" means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.  For the purposes of this subchapter, consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job.

42 U.S.C. § 12111(8). *See generally,* 29 C.F.R. § 1630.2(n)(3).[4]

Although the determination of whether a given function is "essential" within the meaning of the ADA and regulations promulgated thereunder is typically a question of fact for the jury and thus not suitable for resolution through a motion for judgment as a matter of law, the determination of "essentialness" is considered a question of law where state law requires that individuals performing the occupation must meet certain qualifications.  *See Brickers v. Cleveland Board of Education*, 145 F. 3d 846, 849-50 (6th Cir. 1998) (where the state's administrative code set out qualifications for "aides for handicapped pupils" which included the "[p]hysical capability of appropriately lifting and managing handicapped pupils when necessary," the school board was

---

[4] The accompanying regulation, 29 C.F.R. § 1630.2(n)(3), enumerates seven non-exclusive factors to weigh in determining whether a function is "essential" to a particular job: "(i) The employer's judgment as to which functions are essential; (ii) Written job descriptions prepared before advertising or interviewing applicants for the job; (iii) The amount of time spent on the job performing the function; (iv) The consequences of not requiring the incumbent to perform the function; (v) The terms of a collective bargaining agreement; (vi) The work experience of past incumbents in the job; and/or (vii) The current work experience of incumbents in similar jobs."  29 C.F.R. § 1630.2(n)(3).  *See Hoskins v. Oakland County Sheriff's Department*, 227 F.3d 719, 726 (6th Cir. 2000) (in determining whether a particular function is essential in the context of the ADA, the regulations instruct the court to consider the list of factors set forth in 29 C.F.R. § 1630.2(n)(3)).  Here, plaintiff's job description, which includes the physical exertional requirements which are "essential functions" of the RCA position, would fall within factors (i) and (ii).  However, because individuals employed in RCA positions must meet the State of Michigan's physical exertional requirements, the seven non-exclusive factors listed in 29 C.F.R. § 1630.2(n)(3) are subject to these state-mandated requirements.

17

required to comply with state law and hire only those applicants able to lift the handicapped pupils; thus, where the plaintiff admitted that she could not perform this essential function mandated by state law, with or without an accommodation, she was not a "qualified individual with a disability" under  § 12111(8) and failed to make out a prima facie case of discrimination under the ADA).

Here, it is undisputed that plaintiff could not perform all of the duties of the RCA position, as prescribed by the state regulations, from August 17, 2009 (the date set forth in Dr. Peltier's first "off work" note)  through December 15, 2011 (the date of Dr. Peltier's deposition). Because plaintiff could not have returned to her past employment either with or without an accommodation, she was not a "qualified individual" under the ADA,  and cannot establish the second element of a prima facie case under the ADA.  Accordingly, NLCMH is entitled to summary judgment on plaintiff's ADA claim.[5]

### C.      Count II: COBRA violations

### 1.      Continuation of Group Health Plan

### a.      Legal Standard

Plaintiff claims that NLCMH failed to provide her with timely notice of her right to elect COBRA coverage of her group health plan.  *See* 29 U.S.C.  § 1166 (COBRAs "Notice Requirements") and 29 U.S.C.  § 1132 ("Civil Enforcement" of claims under the Employee Retirement Income Security Act (ERISA)); *McDowell v. Krawchison*, 125 F.3d 954, 961 (6th Cir. 1997) (recognizing that COBRA is an amendment to ERISA and that COBRA notice rights are analyzed in the context of ERISA).  In *Holford v. Exhibit Design Consultants*, 218 F. Supp. 2d 901

---

[5] Because plaintiff cannot establish the second element of a prima facie case of discrimination under the ADA it is unnecessary to address NLCMH's second argument that she also failed to establish the third element of the prima facie case

(W.D. Mich. 2002), the court summarized the notice requirements of COBRA as gleaned from the

"well-tilled ground of COBRA litigation." *Holford*, 218 F. Supp. 2d at 905.

First, the court addressed the timing of the notice:

The notification requirements of COBRA are clear.  In the event of a covered employee's termination, an employer must notify the administrator of the group health care plan within thirty days, [29 U.S.C.] § 1166(a)(2); the administrator then has fourteen days to notify the qualified beneficiary of her right to continue coverage, and this period may be longer if the plan is a multiemployer group health care plan and it so provides. *Id.* § 1166(a)(4).  An employer or plan administrator who sends proper notice to the covered employee's last known address is deemed to be in good faith compliance with COBRA's notification requirements. *Truesdale v. Pacific Holding Co./ Hay Adams Div.*, 778 F.Supp. 77, 81–82 (D.D.C.1991); *see also Conery v. Bath Associates*, 803 F.Supp. 1388, 1398 (N.D.Ind.1992) ("Courts that have considered [how notice of eligibility must be communicated] have determined that a good faith attempt to comply with a reasonable interpretation of the provision is sufficient.").

A qualified COBRA beneficiary may elect continuation coverage within sixty days of the qualifying event or of notice of the qualifying event, whichever is later. *Local 217 [v.MHM, Inc.]*, 976 F.2d [805] at 809 [(2d Cir.1992)] (citing 29 U.S.C. § 1162(3)); *Communications Workers of America v. NYNEX Corp.*, 898 F.2d 887, 888–889 (2d Cir.1990) (discussing COBRA); *see also Gaskell v. Harvard Coop. Soc.*, 762 F.Supp. 1539, 1541 (D.Mass.1991) ("Unless and until such notice is given to the employee, the continuation period cannot begin to run.").  Continued coverage extends for a maximum period of eighteen months.  29 U.S.C. § 1162(2)(A).  .  .  .

*Holford*, 218 F. Supp. 2d at 905-06, quoting *Hubicki v. Amtrak Nat. Passenger R. Co.*, 808 F.Supp.

192, 196 (E.D.N.Y.1992).

Second, the court addressed the manner of giving notice:

"Unfortunately, COBRA contains no specific requirements as to the manner in which notice must be given. . . . [The] courts that have addressed the issue have held that 'a good faith attempt to comply with a reasonable interpretation of the statute is sufficient.'" *Smith v. Rogers Galvanizing Co.*, 128 F.3d at 1383–84 (citing *Lawrence v. Jackson Mack Sales, Inc.*, 837 F.Supp. 771, 782 (S.D.Miss.1992), *aff'd*, 955 F.2d 1574 (11th Cir.1992) ("courts have generally validated methods of notice which are calculated to reach the beneficiary"); *see also* H.R.Rep. No. 453, 99th Cong., 1st Sess. 563 (pending promulgation of regulations defining what will constitute adequate notice, "employers are required to operate in good faith

19

compliance with a reasonable interpretation" of COBRA's requirements)).  Courts have generally approved the employer's methods of giving notice where those methods are reasonably calculated to reach the employee.  For example, employers have been found in compliance with section 1166(a) when they send COBRA notices via first class mail to the last-known address of an employee.  *See Myers v. King's Daughters Clinic*, 912 F.Supp. 233, 236 (W.D. Tex.), *aff'd*, 96 F.3d 1445 (5th Cir.1996) (citing *Truesdale v. Pacific Holding Co./Hay Adams Div.*, 778 F.Supp. 77, 81–82 (D.D.C.1991)).

The compulsory character of COBRA's notification requirement has been repeatedly upheld by federal courts, even where the qualified beneficiary had received the initial COBRA notice at the commencement of his/her coverage, or where the employee had personal knowledge of his/her COBRA rights.  *See Mlsna v. Unitel Communications, Inc.*, 41 F.3d 1124, 1129 (7th Cir.1994).  Even where the former employee's duties during employment included the distribution of COBRA notices, as would have been the case with Torres, the employer is not excused from providing that employee with the required COBRA notice.  *Id.* at 1130.  "The fact that [a plaintiff] was given notice of [her] COBRA rights at the commencement of [her] insurance plan  .  .  . , in no way relieves the plan administrator of the second round of notice obligations under [COBRA] after a qualifying event.   .   . [Plaintiff's] personal knowledge of [her] COBRA rights likewise does not nullify the administrator's statutory duty to give notice upon termination."  *Phillips v. Riverside, Inc.*, 796 F.Supp. at 409.

*Holford*, 218 F. Supp. 2d at 906, quoting *Torres–Negron v. Rammallo Bros. Printing, Inc.*, 203 F.Supp.2d 120,124–125 (D. P.R. 2002).

### b.    Discussion

Plaintiff claims that NLCMH failed to offer her COBRA coverage in a timely manner.  Viewing the evidence in the light most favorable to the non-movant (plaintiff), the court concludes that her clam is without merit.  Plaintiff's employment was terminated on November 24, 2009.  Davis Decl. at ¶ 12; Denton Decl. at ¶ 5.  The COBRA notice was sent to plaintiff's last known address on January 7, 2010.  Notice of Continuation of Coverage (Jan. 7, 2010) (docket no. 43-2 at pp. 37-48).  The documents demonstrate that plaintiff was given notice within the 44 days required by the statute.  *See Holford*, 218 F. Supp. 2d at 905-6.  Accordingly, NLCMH is entitled

to summary judgment on plaintiff's claim that it failed to send her timely notice of her right to elect coverage under COBRA.

## 2. Conversion of Group Life Insurance

In her first claim pertaining to conversion of her group life insurance, plaintiff contends that NLCMH failed to provide her with timely notice under COBRA of her right to convert her group life insurance plan into an individual life insurance plan. The court addressed this exact issue in *Noel v. Laclede Gas Company*, 612 F. Supp. 2d 1061 (E.D. Mo. 2009). In *Noel*, the court rejected the plaintiff's claim that the COBRA notice provisions applied to the employee's right to convert a group life insurance policy into an individual life insurance policy:

> In Count I, plaintiffs allege that Laclede failed to notify them of their right to elect continued life insurance coverage following Glennon Noel's termination. Plaintiffs allege that this failure was a violation of the Consolidated Omnibus Budget Reconciliation Act of 1986 ("COBRA"), which requires the Plan Administrator to provide notice of the right to elect continued coverage following the occurrence of a qualifying event, such as termination. Plaintiffs further allege that § 1132(c)(1) provides for statutory penalties of $100.00 per day from the date of the failure to provide notice, and request damages in accordance therewith.

> Via the enactment of COBRA in 1986, Congress amended ERISA to require the plan sponsor of a "group health plan" to allow each qualified beneficiary who stands to lose coverage due to a "qualifying event" to elect continued coverage, and further requires that beneficiaries receive notice of such rights. 29 U.S.C. §§ 1161(a), 1166. Termination of employment is a "qualifying event." 29 U.S.C. § 1163(2). Section 1167 of Title 29 provides that, for purposes of this subchapter, "[t]he term 'group health plan' means an employee welfare benefit plan providing medical care (as defined in section 213(d) of Title 26) to participants or beneficiaries directly or through insurance, reimbursement, or otherwise." Section 213(d) of 26 U.S.C., in relevant part, defines "medical care" as amounts paid "for the diagnosis, cure, mitigation, treatment, or prevention of disease, or for the purpose of affecting any structure or function of the body."

> Based upon the plain statutory language of COBRA, it is clear that the post-termination notice requirements apply to a "group health plan," the definition of which does not encompass a life insurance plan. 29 U.S.C. § 1167(1) and 26 U.S.C. § 213(d). As Laclede notes, this conclusion accords with court decisions

21

considering the type of coverage to which COBRA applies. *See Robin v. Metropolitan Life Ins. Co.*, 147 F.3d 440, 442 n. 4 (5th Cir.1998) ( "ERISA was amended in part by (COBRA) without, however, affecting life insurance"); *Austell v. Raymond James & Assocs.*, 120 F.3d 32, 33 (4th Cir.1997) (rejecting the argument that COBRA required coverage continuation rights for disability policies, reasoning that "the continuation requirement of COBRA is designed to focus on the provision of health care coverage"); *Weeks v. Western Auto Supply Co.*, 2003 WL 21510822, 5 (W.D.Va.2003) [affirmed, *sub nom Estate of Weeks v. Advance Stores Co., Inc.*, 99 Fed. Appx. 470 (4th Cir. 2004)] ("the plain language of these provisions makes clear that the post-termination notice requirements apply to a 'group health plan,' defined as a 'plan providing medical care,' and not to a life insurance plan"); *Cooksey v. Metropolitan Life Ins. Co.*, 2004 WL 1636973, 2 (N.D.Tex.2004) (citing *Robin*, 147 F.3d at 442 n. 4) ("COBRA does not govern the continuation of life insurance benefits.")

*Noel*, 612, F. Supp. 2d at 1064. The court finds the court's analysis in *Noel* to be persuasive authority on this issue. Accordingly, NLCMH is entitled to summary judgment on plaintiff's claim to the extent that she has alleged that NLCMH violated COBRA by providing her with an untimely notice of the option to convert her group life insurance policy.

### D. Untimely submission of life insurance conversion forms

Apart from her COBRA assertions pertaining to her group life insurance, plaintiff also contends that NLCMH's untimely submission of the life insurance conversion forms resulted in the cancellation her life insurance policy. An ERISA fiduciary has a duty to respond to inquiries regarding benefits. *Krohn v. Huron Memorial Hospital*, 173 F.3d 542, 550 (6th Cir. 1999). "This is particularly true where the fiduciary has reason to know that the employee has a particular need for information regarding benefits." *Thorn v. Northside Hospital*, No. 1:07-cv-155, 2008 WL 2600791 at *7-8 (W.D. Mich. June 24,2008), citing *Krohn*, 173 F.3d at 549-51 (employer was liable to the plaintiff for lost long-term disability benefits where it did not advise the plaintiff that the failure to submit a claim and proof of loss to the insurance company in a timely manner would make the plaintiff ineligible to receive the benefits and made "a materially misleading response" to the

plaintiff's husband's inquiry about benefits; court observed that "[a] prudent fiduciary acting in the best interests of its beneficiary would have advised [the plaintiff] that failure to submit a claim and proof of loss to [the insurance company] in a timely fashion would render her ineligible to receive long-term disability benefits" ) and *Palen v. Kmart Corporation*, No. 97-2269, 2000 WL 658115 at *3-4 (6th Cir. May 9, 2000) (employer, who was aware of former employee's illness, was required to provide information about life insurance benefits in response to request for information; employer breached its fiduciary duty of disclosure when it failed to respond completely and accurately to the request for information about a benefit plan it administered).

Genuine issues of material fact exist as to whether plaintiff requested information regarding conversion of the group life insurance policy and whether NLCMH provided a timely response to plaintiff which would allow her to exercise any conversion rights. As discussed, *supra*, there is evidence that plaintiff made inquiries regarding her disability and life insurance coverage and that NLCMH processed her application for conversion of the life insurance coverage in an untimely manner (i.e., contrary to the instructions on the application for conversion of life insurance coverage, the application was not submitted to plaintiff until more than 31 days after the date her employment was terminated). Application for conversion of group life insurance policy (docket no. 43-2 at pp. 50-54). Accordingly, NLCMH's motion for summary judgment should be denied on this claim.

## IV.    Recommendation

For these reasons, I respectfully recommend that defendant's motion for summary judgment (docket no. 42) be **DENIED** as to plaintiff's claim that NLCMH failed to submit the group

life insurance policy conversion application in a timely manner (*see* § III.D., *supra*)   and

**GRANTED** in all other respects.


Dated:  June 1, 2012                                    /s/ Hugh W. Brenneman, Jr.
                                                        HUGH W. BRENNEMAN, JR.
                                                        United States Magistrate Judge



ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report.  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order.  *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).